# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Tammi Broussard and Deborah Vazquez-Martinez, *as trustees for the next of kin of Leroy Krogstad, deceased*,<br><br>          Plaintiffs,<br><br>v.<br><br>The United States of America,<br><br>          Defendant. | No. 23-cv-1857 (KMM/DJF)<br><br>**ORDER** |

     Leroy Krogstad honorably served the United States as a member of the United States Marine Corps ("USMC") during the Vietnam War. Later in life, Mr. Krogstad suffered from health problems, and on January 11, 2021, he was admitted to the Veterans Administration Medical Center in Minneapolis ("Minneapolis VA"). After his arrival, his condition worsened, and VA staff placed him on a ventilator. Because he was not expected to make a full recovery, several members of Mr. Krogstad's family decided that he should be extubated on January 22, 2021, but VA staff mistakenly did so on the afternoon before. The government acknowledged its error and apologized to Mr. Krogstad's family.

     Two of Mr. Krogstad's adult children were appointed as the trustees for Mr. Krogstad's next of kin. They filed this lawsuit to recover damages from the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* The government now moves for summary judgment. ECF No. 50. Having carefully reviewed the record, the Court finds that Plaintiffs have not provided any evidence of compensable

damages for this type of suit. Therefore, the Court grants the government's summary-judgment motion and dismisses the action.

## BACKGROUND

Mr. Krogstad was born on May 7, 1948, and he served in the USMC from 1967 to 1969. ECF No. 1 ¶¶ 11–12. Mr. Krogstad was a decorated Marine and was honorably discharged. *See* ECF No. 8 ¶ 12. He is survived by Tammi Broussard and Deborah Vazquez-Martinez (Plaintiffs), who are his two oldest daughters. Mr. Krogstad's other family members include his children Brian, Katie, Matthew, Jonathan, and Rebecca; his ex-wife Susan Krogstad; and his sister Sharon Bartone and his brother in law Mike Bartone.[1] *See* Ex. Z[2] at 14–18; *In re Appointment of a Tr. for the Heirs of LeRoy Arthur Krogstad*, No. 62-CV-21-6057 (Minn. Dist. Ct. Nov. 12, 2021) (Index #1 ¶ 3).[3]

On January 11, 2021, Mr. Krogstad arrived at the Minneapolis VA exhibiting confusion, slurred speech, and labored breathing. ECF No. 1 ¶ 13. At that time, VA staff was not sure who to contact or when he was last well. Ex. A at 1. Mr. Krogstad was diagnosed with acute liver failure and encephalopathy. Ex. C at 3. On January 12, 2021, after his condition worsened, VA staff placed Mr. Krogstad on a ventilator. Ex. U at 12–13; *see also* Ex. D at 1. Progress notes from January 20, 2021 indicate that Deborah had

---

[1] For the sake of clarity, the Court refers to Mr. Krogstad's family members by their first names.

[2] Unless otherwise indicated, the exhibits cited in this Order refer to the exhibits attached to the Declaration of David Fuller. ECF No. 53.

[3] Minn. Court Records Online (MCRO), Minn. Jud. Branch, https://publicaccess.courts.state.mn.us/ (click "Case Search"; then select "Case Number"; and enter case number).

been involved in Mr. Krogstad's care but that no person with medical power of attorney was listed in his chart. Ex. C at 5.

On January 20, 2021, VA staff met with Tammi, Deborah, Sharon, and Mike to discuss Mr. Krogstad's health. Ex. D at 1. VA staff relayed that Mr. Krogstad was "very sick" and "medically complex with ongoing altered mental status, acute . . . chronic liver injury and worsened heart failure." *Id.* According to VA staff, it was unclear if Mr. Krogstad's "brain [would] ever recover." *Id.* The family members at that meeting decided to take Mr. Krogstad off the ventilator. Ex. D at 1. They "stated that they would like to reach out to a few family members to see if they would like to see [Mr. Krogstad] before transitioning [him] to comfort care." *Id.* They also asked that Mr. Krogstad, who was Catholic, receive a visit from the chaplain. *Id.*; Ex. E at 1.

After the meeting, Plaintiffs contacted Mr. Krogstad's other family members who were able to visit him over the next few days. Ex. BB at 16–18; Ex. CC at 23–25; Ex. DD at 18–21, 23; Ex. EE at 13–14, 26 Ex. FF at 24–25. Plaintiffs, Sharon, and Mike were able to visit Mr. Krogstad in person at the VA on January 20th. Ex. KK at 41. Mr. Krogstad was unconscious during these visits. Ex. BB at 25; Ex. CC at 17, 21; Ex. FF at 23–24.

Social worker Sara Lassig prepared Mr. Krogstad's end-of-life paperwork with some of his family members. Ex. E at 2. Ms. Lassig's note from January 21, 2021 stated that the plan was for Mr. Krogstad to be extubated on January 22nd. Ex. F.[4] Another

---

[4] Sharon testified that the family had not definitively decided to have Mr. Krogstad's breathing tube removed. Ex. W at 45.

3

licensed clinical social worker and three doctors acknowledged receipt of the note later that day. *Id.*

When VA staff met on the morning of January 21, 2021, several staff members believed that the plan was to extubate Mr. Krogstad that day, rather than on January 22nd. Ex. Y at 14–16; Ex. T at 13–14; Ex. X at 11–12; Ex. AA at 14–15, 24–26; *see also* ECF No. 52 ¶ 4.

Leslie Albrecht-Greco, the ICU nurse on duty that day, talked with Susan and one of her adult children, who were "the only family" of Mr. Krogstad of which she was aware. Ex. T at 13, 20–21. After these family members confirmed that they were ready to have Mr. Krogstad taken off the ventilator, Nurse Albrecht-Greco found a respiratory therapist, Mark Hawkins, to remove the breathing tube, and Mr. Krogstad was extubated. Ex. T at 20–21. There were no complications with the extubation. Ex. T at 37. Mr. Krogstad passed away at 8:40 p.m. on January 21, 2021, about five and a half hours after the extubation. ECF No. 1 ¶¶ 16–17.

Plaintiffs were not at the hospital when Mr. Krogstad was extubated but rushed to the hospital after Katie called them upset and confused and told them that the breathing tube had been removed. Ex. KK at 47–50. Tammi and Deborah spent time with their father between the extubation and his death. Ex. KK at 57–59; Ex. Z at 95; *see also* Ex. O at 8. Plaintiffs left the VA hospital briefly to get something to eat, and while they were away, Mr. Krogstad passed. Ex. KK at 62–63 (Deborah Dep.); Ex. Z at 65–66 (Tammi Dep.).

After Mr. Krogstad's death, Nurse Albrecht-Greco and Mr. Hawkins, were temporarily suspended from providing direct patient care while an investigation into the

events that resulted in Mr. Krogstad's early extubation was pending. Exs. K–L. The VA's investigation found that Nurse Albrecht-Greco had acted carelessly in directing Mr. Hawkins to remove Mr. Krogstad's breathing tube without an order from a provider. Ex. M. Nurse Albrecht-Greco left the VA in April 2021. Ex. T at 12. And Mr. Hawkins received a reprimand for extubating Mr. Krogstad without a physician order. Ex. N; Ex. AA at 9. The VA later held a "disclosure meeting" with Tammi and Deborah at which the VA apologized for the error. Ex. S at 1; Ex. I at 1.

In November 2022, Plaintiffs filed administrative tort claims with the VA, but the government denied them. Ex. O (Claim for Damage, Injury, or Death); Ex. P[5]; ECF No. 8 ¶ 6. Plaintiffs then filed this action under the FTCA, asserting two causes of action: (1) negligence resulting in wrongful death, and (2) medical malpractice. ECF No. 1 ¶¶ 4–5. They allege that in failing to follow the family's end-of-life plan, the VA caused Mr. Krogstad's death and that his heirs and next of kin "lost the counsel, guidance, aid, advice, comfort, and protection that [Mr. Krogstad] would have given them if [he] had lived." ECF No. 1 ¶ 23; *see also id.* ¶ 34.

In their initial disclosures about how any claimed category of damages should be computed, Plaintiffs stated: "A claim is made by [Mr. Krogstad's] heirs and the determination of this sum will be made by the jury. In addition, Plaintiff is entitled to non-economic damages to be determined by the jury." Ex. Q at 12. Plaintiffs did not supplement

---

[5] There are two administrative claim forms in the record because Plaintiffs originally submitted one *pro se*, Ex. O, and they filed the second through counsel attaching a copy of the state court order appointing them as co-trustees for Mr. Krogstad's heirs and next of kin, Ex. P.

5

this disclosure. During discovery, the government asked Plaintiffs to identify each injury resulting from the government's acts. Ex. S at 11. Plaintiffs responded:

> Plaintiffs and others that were present at [Mr. Krogstad's] bedside at his passing were robbed of that last goodbye. This was a traumatic and dramatic end of Plaintiffs' father's life. Plaintiffs worked for months after to figure out what happened and to communicate with those that had the power to make a change aware of the circumstances so that this wouldn't happen again. Plaintiffs still grieve the loss of their father and this is compounded by the circumstances of his early death.

*Id.*; *see also id.* at 15 (discussing, in response to request to "describe all activities . . . that Plaintiffs can no longer do as a result of the injuries alleged in the Complaint," Plaintiffs' "fond memories of" their father and activities they had done with him in the past that they could no longer engage in).

After the conclusion of the discovery phase of the case, the government filed its motion for summary judgment. ECF No. 50. After the motion was fully briefed, ECF Nos. 51, 56, 58, the Court canceled the hearing and took the matter under advisement on the written submissions, ECF No. 59.

## DISCUSSION

### I. Summary-Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Cearley v. Bobst Gr. N. Am. Inc.*, 129 F.4th 1066, 1069 (8th Cir. 2025). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 323. A fact is "material" only if its resolution

6

"might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lankford v. City of Plumerville, Ark.*, 42 F.4th 918, 921 (8th Cir. 2022). And a dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts create a genuine issue for trial. *Anderson*, 477 U.S. at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). On summary judgment, courts must view the evidence and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Becker v. City of Hillsboro*, 125 F.4th 844, 851 (8th Cir. 2025). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255).

**II.   Analysis**

In its motion for summary judgment, the government raises three arguments: Plaintiffs (1) cannot prove the elements to support their claims for malpractice or wrongful death; (2) cannot show the government's alleged negligence caused them any compensable damages; and (3) were themselves substantially at fault for what happened. ECF No. 51 at 22–29. Because the Court agrees with the government's argument concerning damages, the government's motion is granted, and the Court declines to reach the remaining issues.

### A.     Applicable Legal Standards

Although the United States has sovereign immunity and cannot be sued without its consent, "Congress waived . . . immunity for claims arising out of torts committed by federal employees" through the FTCA. *Mancini v. United States*, 135 F.4th 592, 600 (8th Cir. 2025) (citing *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217–18 (2008)). Relevant here, the FTCA provides that district courts have exclusive jurisdiction over claims against the government "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Mancini*, 135 F.4th at 600 ("The applicable tort law is the law of the place where the act or omission occurred.") (quotations omitted). Because the alleged medical malpractice in this case occurred in Minnesota, the Court applies Minnesota law to Plaintiffs' claims. *See Mancini*, 135 F.4th at 600.

In Minnesota, a medical malpractice claim is a "species of common-law negligence." *Rygwall v. ACR Homes, Inc.*, 6 N.W.3d 416 (Minn. 2024). To prevail on such a claim, a plaintiff must establish four elements: "(1) the standard of care recognized by the medical community as applicable to the particular defendant's conduct; (2) a departure from that standard; (3) that the defendant's departure from the standard of care was a direct cause of the plaintiff's injuries; and (4) damages." *Mattke v. Deschamps*, 374 F.3d 667, 671 (8th Cir. 2004) (quotation omitted) (citing *Tousignant v. St. Louis Cnty.*, 615 N.W.2d 53, 59 (Minn. 2000)); *see also Mancini*, 135 F.4th at 600 (citing *Rygwall*, 6 N.W.3d at 431). These same four elements apply to a wrongful-death claim based on medical

8

malpractice. *Daulton v. TMS Treatment Ctr., Inc.*, 2 N.W.3d 331, 336 (Minn. Ct. App. 2024) (citing *Tousignant*, 615 N.W.2d at 59).

A wrongful-death action in Minnesota "is solely a creature of statute." *Tiedeken v. Tiedeken*, 363 N.W.2d 909, 910 (Minn. Ct. App. 1985); *see also Fussner v. Andert*, 261 Minn. 347, 113 N.W.2d 355, 357 (1961) ("At common law a civil action for wrongful death was not permitted; the only recourse against the wrongdoer being by criminal action."). Today, the Wrongful Death Act allows recovery of two categories of damages: (1) "the amount . . . for all damages suffered by the decedent resulting from the injury prior to the decedent's death"; and (2) "the pecuniary loss resulting from the death," to be shared by the "surviving spouse and next of kin, proportionate to the pecuniary loss severally suffered by the death." Minn. Stat. § 573.02, subd. 1 (2025).[6]

The Wrongful Death Act does not define what constitutes the "pecuniary loss" of the decedent's heirs and next of kin. However, Minnesota courts have explained that it is "not limited to the loss of income" and "includes the loss of aid, advice, comfort, assistance, and protection which the survivor reasonably could have expected if the decedent had lived." *Mattson v. Burlington N. R.R. Co.*, No. C5-89-1253, 1990 WL 1727, at *1 (Minn.

---

[6] Until a recent amendment, the Wrongful Death Act did not allow for recovery of any personal injury suffered by the decedent prior to their death. *See* Minn. Stat. § 573.02, subd. 1 (2022) (allowing recovery for only "the amount . . . [for] the pecuniary loss resulting from the death). The amended version of the Act was finally enacted on May 20, 2023, and the new language allowing for recovery of damages suffered by a decedent before their death applies to cases filed after its enactment. 2023 Minn. Sess. Law Serv., c. 52 (S.F. 2909), art. 19, §§ 33, 34 (WEST) (effective date language). Plaintiffs filed this case on June 20, 2023.

Ct. App. Jan. 16, 1990) (citing *Rath v. Hamilton Standard Div. of United Techs. Corp.*, 292 N.W.2d 282, 284 (Minn. 1980), and *Fussner*, 113 N.W.2d at 363). Among the factors for determining the pecuniary loss of Mr. Krogstad's next of kin are his "life expectancy at the time of death," as well as the "future counsel, guidance, and aid" and "future advice, comfort, assistance, companionship, and protection" that Mr. Krogstad would have given if he had lived. *Youngquist v. W. Nat. Mut. Ins. Co.*, 716 N.W.2d 383, 386 (Minn. Ct. App. 2006) (citing CIVJIG 91.75 (1999)).[7] However, the recoverable pecuniary loss for Mr. Krogstad's next of kin does not include "purely emotional damages resulting from 'grief, sorrow or mental anguish." *Frumkin v. Mayo Clinic*, 965 F.2d 620, 627 (8th Cir. 1992) (quoting *Fussner*, 113 N.W.2d at 357); *Holtegaard v. Soo Line R.R Co.*, No. A13-2079, 2014 WL 3396871, at *3 (Minn. Ct. App. July 14, 2014) ("The death of a loved one inflicts great pain, but the law does not permit recovery for other than pecuniary loss."); *Steinbrecher v. McLeod Co-op. Power Ass'n*, 392 N.W.2d 709, 714 (Minn. Ct. App. 1986) (same).

### B.   No Evidence of Compensable Damages

Considering the legal framework described above, the Court turns to the government's argument that Plaintiffs' claims fail because they have presented no evidence

---

[7]   The other factors for a jury to consider in determining a fair amount of damages include the decedent's "past contributions," "health, age, habits, talents, and success"; "occupation"; "past earnings"; "likely future earning capacity and prospects of bettering oneself had [they] lived"; "living expenses"; "legal obligation to support spouse or next of kin and the likelihood of fulfilling that obligation"; "reasonable funeral and necessary medical expenses"; and "probability of paying off existing debts." *Youngquist*, 716 N.W.2d at 386 (quoting CIVJIG 91.75 (1999)).

of compensable damages. The Court concludes that Plaintiffs' wrongful-death and medical-negligence claims fail for lack of evidence of compensable damages.[8]

To survive the government's motion for summary judgment, Plaintiffs must point to evidence that would allow a reasonable jury to find some form of compensable damages caused by the alleged malpractice. This could include evidence showing that, prior to his death, Mr. Krogstad himself suffered damages (e.g., pain, discomfort, suffering) from the government's early removal of his breathing tube. Minn. Stat. § 573.02, subd. 1 (allowing recovery of "all damages suffered by the decedent resulting from the injury prior to the decedent's death"). It could also include evidence of Mr. Krogstad's surviving family members' "pecuniary loss." *Id.* (providing for recovery of "the pecuniary loss resulting from the death . . . for the exclusive benefit of the surviving spouse and next of kin"). This would allow Mr. Krogstad's next of kin to recover an amount to compensate them for the loss of reasonably expected income, "aid, advice, comfort, and protection" that they would have received from Mr. Krogstad if the breathing tube had not been removed a day earlier than planned. *See Youngquist*, 716 N.W.2d at 386 (discussing the concept of pecuniary loss and listing 12 factors to consider in determining a fair amount). But it excludes evidence of purely emotional damages resulting from their grief, sorrow, or mental anguish.

---

[8] The death of a loved one is a traumatic experience for family members, and the Court has no doubt that the circumstances of Mr. Krogstad's passing caused Plaintiffs and his other family members legitimate grief and sorrow. The confusion surrounding the VA's premature extubation of Mr. Krogstad surely complicated and amplified those feelings. The Court's analysis in this Order does not reflect any judgment about the legitimacy of their grief. Rather, the Court's discussion flows only from the duty to apply the governing law to the facts of this case.

*Frumkin*, 965 F.2d at 627. For several reasons, the Court finds that Plaintiffs' wrongful-death and medical-negligence claims fail for lack of evidence of compensable damages.

### *Pecuniary Loss*

Start with the question of "pecuniary loss" to Mr. Krogstad's heirs and next of kin. Here, the Court finds, as a matter of law, that Mr. Krogstad's next of kin suffered no recoverable "pecuniary loss." There is no dispute that Mr. Krogstad was intubated shortly after he arrived at the hospital when his condition on arrival worsened. From that point on, he was unconscious and unresponsive. By the time the family members had a conference with VA staff on January 20th to discuss end-of-life decisions, he had been unconscious for several days. Because there was no reasonable prospect for Mr. Krogstad's brain to recover, his family members present at that conference made the decision that he should be extubated on January 22nd and transitioned to comfort care through the end of his life. His breathing tube was removed earlier than planned on January 21st, but the evidence indicates that he remained unconscious for the next five and a half hours until he died. ECF No. 53 ¶ 6–7; Ex. T at 35–36, 37; Ex. U at 13. The only reasonable inference from these undisputed facts is that if Mr. Krogstad had not been extubated on January 21st, he would have remained unconscious and unresponsive until January 22nd, and the breathing tube would have been removed, as planned. Because Mr. Krogstad was unconscious and unresponsive when the alleged negligent act occurred, he was not expected to recover, and he was scheduled to be extubated the very next day, his family members could not reasonably have expected that Mr. Krogstad would have provided them with any future income, aid, advice, comfort, assistance, or protection. In their opposition to the

government's summary judgment motion, Plaintiffs do not point the Court to any evidence to the contrary. Nor do Plaintiffs identify any caselaw suggesting that surviving next of kin experience "pecuniary loss" within the meaning of the Wrongful Death Act under similar circumstances.

Plaintiffs' remaining arguments do not persuade the Court that there is a genuine issue for trial concerning "pecuniary loss." For example, Plaintiffs argue that "[d]amages are generally a question of fact for the jury and summary judgment on the issue of damages is generally not appropriate." ECF No. 56 at 7–8 (citing, *inter alia*, *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 475 (Minn. Ct. App. 1999)). But this general rule relates to the factual question of *how much* to award in damages, not the question presented in this case. Here the question is whether there is any evidence of the kind of damages that are recoverable under the law. Summary judgment is inappropriate where there is no evidence of compensable damages. *Doe v. Kmart Corp.*, No. A16-0465, 2017 WL 474404, at *5–6 (Minn. Ct. App. Feb. 6, 2017) (finding that defendant was entitled to summary judgment on plaintiffs' negligence claim because there was insufficient evidence of compensable damages).

The remaining harms that Plaintiffs identify are not recoverable forms of damages—they are emotional harms indistinguishable from grief, sorrow, or mental anguish at the loss of Mr. Krogstad. For example, Plaintiffs argue that rather than focusing on the grief they experienced at the end of their father's life, they were forced to focus on the VA's failure to comply with their end-of-life plan for him. In other words, they claim that because of the VA's error, their grieving process was made unnecessarily complicated. But that has

no bearing on the type of support or care they could have expected from Mr. Krogstad if he would have been extubated on January 22nd instead of the 21st. Rather, the harm they describe concerns their non-compensable emotional response to the circumstances of Mr. Krogstad's death.

Next, Plaintiffs more explicitly invoke the emotional and mental harm they suffered from having Mr. Krogstad pass a day earlier than expected. They identify the following categories of damages: being denied a final goodbye with their father; the traumatic nature of the experience of how their father passed; and their continuing grief at having lost their father being compounded by the circumstances of his passing. Ex. S at 11.[9] These harms constitute purely emotional damages, mental anguish, grief, or anguish that are not recoverable in a case like this. *Frumkin*, 965 F.2d at 627*Holtegaard*, 2014 WL 3396871, at *3.

For these reasons, the Court concludes that there is no genuine issue of material fact on the issue of "pecuniary loss," and consequently, this aspect of Plaintiffs' claims fails because there is no genuine issue of compensable damages.

### *Decedent's Damages*

Next, the Court considers whether Mr. Krogstad himself suffered damages (e.g., pain, discomfort, suffering) from the government's early removal of his breathing tube. Minn. Stat. § 573.02, subd. 1 (allowing recovery of "all damages suffered by the decedent resulting from the injury prior to the decedent's death"). The government argues that this

---

[9] Plaintiffs' initial disclosures and responses to the government's discovery requests did not otherwise identify any recoverable "pecuniary loss."

claim fails because there is no medical evidence to support these damages. As explained below, whether the evidence in the record could support a claim that Mr. Krogstad experienced pain and suffering after the extubation is unclear. But ultimately, the Court does not need to decide this issue because this claim fails for another reason.

As discussed, when Mr. Krogstad was extubated on January 21st, he had been unconscious for more than a week, and evidence indicates he never regained consciousness. Ex. U at 12–13; Ex. T at 35–36. For example, Dr. Benjamin Henkle, a board-certified physician in Internal Medicine, Pulmonary Disease, and Critical Care Medicine with a Masters in Public Health, observed that "some family members who were present around the time of Mr. Krogstad's extubation observed his body making gasping, 'thrashing,' or other motions, and saw tears in his eyes, and that he appeared uncomfortable to them." ECF No. 52 ¶ 6. Dr. Henkle further explained that, based on his medical training and years of experience in the ICU, "the bodies of unconscious patients will often respond in such ways," but such "involuntary physical responses do not necessarily mean the patient is experiencing pain or discomfort."[10] *Id.*; *see also id.* ¶ 7 ("My review of the medical records does not suggest anything was done wrong medically or technically during the extubation of Mr. Krogstad, or that his body responded in any unusual way to the extubation[.]"). Plaintiffs point to no evidence from an expert witness contradicting Dr. Henkle's testimony.

---

[10] Relatedly, Nurse Albrecht-Greco testified that she arranged for Mr. Krogstad to be given medication to address signs of "distress." However, because he was unconscious, she stated it was possible that he was not aware that his body was experiencing any distress. Ex. T at 39.

Several of Mr. Krogstad's family members did, indeed, testify regarding their observations when they visited him at the VA hospital. They explained that both before and after the removal of the breathing tube, they observed Mr. Krogstad's head and body make certain movements and saw tears in or near his eyes. Ex. Z at 65; Ex. KK at 50; Ex. FF at 27–28; Ex. BB at 14. But there is no evidence in the record from which the Court could conclude that Plaintiffs or any of Mr. Krogstad's other next of kin possess any specialized knowledge, training, or experience that qualifies them to provide an opinion that the things they saw suggest that Mr. Krogstad regained consciousness and experienced pain in those moments.

It does not appear that Minnesota appellate courts have decided whether expert testimony is required to establish that a decedent who was unconscious prior to their death felt any pain or experienced any suffering. The parties do not address this issue in their briefing. At least one court has declined to consider lay testimony to support the conclusion that a decedent suffered pain while unconscious. *Cominsky v. Donovan*, 846 A.2d 1256, 1260 (Pa. Super. Ct. 2004). Another court at least suggests that lay testimony about observations of an unconscious person's "outward manifestations" might be enough to defeat a motion arguing that there is no evidence of pain and suffering. *Meeks v. Pang*, 545 P.3d 226, 240 (Utah 2024) ("[Plaintiff] offered no medical evidence that Ms. Birt was experiencing pain or suffering in her final hours. *And she offered no lay testimony about any outward manifestations that might indicate Ms. Birt was experiencing pain or suffering during that time*.") (emphasis added). The government asserts that "the law presumes an unconscious individual does not experience any pain or suffering," ECF No. 58 at 7, but

16

the cases they cite for that proposition do not address whether lay testimony about observations of an unconscious person is sufficient to overcome a motion for summary judgment arguing that there is no evidence of pain and suffering. *See, e.g.*, *Russell v. Ramirez*, 949 S.W.2d 480, 491–92 (Tex. Ct. App. 1997) (affirming a trial court's elimination of an award for conscious pain and suffering where there was "*no evidence from any source* that [the decedent] ever regained consciousness or displayed any conscious signs of pain or suffering") (emphasis added); *Klawes v. Firestone Tire & Rubber Co.*, 572 F. Supp. 116, 120–21 (E.D. Wis. 1983) (stating that "[p]ain and suffering does not legally occur unless one is conscious," but denying defendant's summary judgment motion where the decedent's widow submitted an affidavit discussing her husband's post-accident response to stimuli).

In sum, the Court has some doubts about the sufficiency of the lay testimony in the record to establish that Mr. Krogstad did, in fact, regain consciousness and experienced pain and suffering. But this question is not explored in depth by the parties in their briefing and the Court has not found a definitive answer under the governing state law. The Court concludes it is unnecessary to resolve this issue because, even if the evidence in the record was sufficient to create a triable issue on this question of damages, the Court finds that Plaintiffs' claim fails for a different reason—a problem of causation.

### C. Causation

Plaintiffs' claim that Mr. Krogstad was harmed by Defendant's medical negligence requires proof that such harm was caused by the negligent act. Proof of causation involves a comparison of "what actually happened with a hypothetical situation identical to what

17

actually happened but without the negligent act." *Mancini*, 135 F.4th at 601 (quoting *Rygwall*, 6 N.W.3d at 429).

Plaintiffs do not claim, and provide no evidence to suggest, that the *manner* of the extubation reflected negligence or malpractice. Rather, the alleged negligent act was the *fact* of the extubation one day before it was scheduled to take place. Comparing what actually happened with a hypothetical situation identical to what actually happened, but without the negligent act here means imagining a scenario in which the extubation took place in precisely the same way, but one day later. Plaintiffs have not shown that in such a scenario, Mr. Krogstad's body would have responded any differently to having the breathing tube removed. In fact, the evidence in the record suggests that his response would have been the same. ECF No. 53 ¶ 7 ("Based on my understanding of Mr. Krogstad's condition and my review of the medical records, I have no reason to think his experience or response to extubation would have been any different had the extubation occurred one day later, on January 22, 2021."); Ex. T at 39. In other words, the error of removing the tube a day early had nothing to do with the alleged pain and suffering Mr. Krogstad experienced.

Under these circumstances, no reasonable jury could conclude that the *premature* removal of the breathing tube (*i.e.*, the alleged departure from the standard of care) was a direct cause of any pain and suffering of Mr. Krogstad prior to his death. *See Mattke*, 374 F.3d at 671 (citing *Tousignant*, 615 N.W.2d at 59). Consequently, Plaintiffs cannot prevail on their medical negligence claim and the government is entitled to summary judgment on

Plaintiffs' claim for "damages suffered by [Mr. Krogstad] . . . prior to [his] death." Minn. Stat. § 573.02, subd. 1.

## ORDER

**IT IS HEREBY ORDERED THAT**:

1. Defendant's Motion for Summary Judgment (ECF No. 50) is **GRANTED**.

2. This matter is **DISMISSED WITH PREJUDICE**.

**Let Judgment be entered accordingly.**

Date: December 19, 2025          *s/Katherine Menendez*
                                 Katherine Menendez
                                 United States District Judge